F.B.I. Supervising Special Agent in his individual capacity at L. Mr. Heffitz for the appellant, Mr. Whitaker for the appellees. Good morning, your honors. This case presents a limited but fundamental question. Doesn't  an American citizen have any remedy against FBI agents who coercively interrogated him with threats of disappearance and death and denied him access to a court for four months to compel a confession? This case addresses the same core misconduct as Bivens, an innocent American citizen seeking redress against law enforcement agents who engaged in gross misconduct to obtain evidence of a crime. Dismissing under special factors would create a gaping exception to Bivens for American citizens abroad. It would create the perverse incentive or perverse result that law enforcement agents can violate the Fourth and Fifth Amendment rights of citizens abroad with impunity and face judicial scrutiny only if they submit a case to prosecution. This result contradicts the core principle of Bivens, which provides a remedy when a citizen not accused of any crime is subjected to a constitutional violation at a Mitchell v. Forsyth, which says the rationale for Bivens applies even more forcefully in defense of law enforcement officials implicating national security. A Bivens remedy must be available because this case does not present a new context and because even if it did, Mr. Mishaba has no alternative remedy and the balance of factors weighs in favor of recognizing a Bivens remedy. Further, defendants are not entitled to qualified immunity because the right of a private American citizen to be free of month-long extrajudicial detention and coercive interrogation was abundantly clear, whether at home or abroad. You are aware of our Doe precedent, and although you, I think, with some formal plausibility, characterize this as the kind of claim against a kind of defendant as to which we've recognized Bivens case's claims in the past, the question is here, isn't this actually really quite different? I mean, what do you anticipate you need to prove were this Bivens case to go forward? Wouldn't it have to inquire into what were the reasons that Mr. Mishaba was picked up where he was picked up? What was the government's program in sifting through the people coming out of Somalia going to Kenya? What was the relationship between the United States FBI and the law enforcement in those countries? So it quickly seems that we would get into areas that touch on our national security and foreign relations. Yes, Judge Peller. As we explained, this case is distinct from Doe, which was focused specifically in the context of military detention of a service, of a contractor, so effectively of a soldier in a war zone. And here we're dealing with the same categories as Bivens. It's a different fact pattern for sure, but it's the same fundamental category. It's a suit by a private citizen against law enforcement officials. I'm asking a question at a little more concrete and granular level. You know, you would go forward and you would have your client testify that he, you know, all the things that are in the complaint. I was wandering through the woods, they picked me up. And the government then would turn around and have to provide some basis and justification and context. And the first thing that they would have to do would be to put them in a very different position, I think, from the federal narcotics agents in the Bivens case. No? I mean, how do you envision that going at a more granular level? So I think your question really is going more to the foreign relations aspect as opposed to the national security aspect. But let me respond. The inquiry here, our basic claim which we've pled is that the FBI agents had control of Mr. Mishal and exercised that control by giving him a choice, face disappearance or death or confess. The detention claim, our claim, our Fourth Amendment claim, our detention claim, we would need to prove what we've alleged, that the FBI agents were in fact in control of Mr. Mishal and that the foreign officials, the Kenyan Ethiopian officials, were agents. This is an inquiry, this is precisely the inquiry that federal courts conduct in criminal cases where there's an allegation that evidence obtained by foreign agents was done at the court in the Abu Ali case which involved a similar situation. The foreign agents as foreign officials as agents of the U.S. is not, it's an inquiry, he said, is not unusual for federal courts. It's done, it's done frequently, site cases in our briefs to that effect, the Karaki case, the Mount case, the Vittorio case. So this is an inquiry that courts undertake all the time and... I'm sorry to interrupt you. Go ahead. I was just going to say, at the end, the remedy may be different. Here it's damages and there it was suppression, but the whole point of Bivens is to provide a remedy for the individual whose rights are abused by FBI agents and who's not charged with a crime. I think one of the things the government would say, and they've said in their briefs, is criminal cases are different because the government can choose whether to bring those cases or not. So they're taking it upon themselves, is it worth it to us to deal with this? Do we have a plan for how we're going to deal with these foreign relations and national security questions? Whereas here, anybody could bring a Bivens case were you to prevail and not in their control. But there's no, there's no, I mean, that is Bivens. That's the teaching and the lesson of Bivens and Justice Harlan's concurrence, is the citizen whose rights are violated, there's a complete constitutional violation and they're not brought to trial. Suppose the defendant here were CIA or military, same rule? A CIA or military officer? If it was military detention, I mean, that's a different case. If it was military detention, that would be a different defendant. That would be a different category of defendant that was very focused on the identity of the defendant. So if it was a military detention outside of war zone, well, that would be different than DOE, but it would be different from this case as well. What about CIA? CIA defendant? The same thing. It's a different category of defendant. It's a law enforcement agent and it's a criminal investigation. Well, to follow up on that, because you and the government characterize this differently. You say this is a criminal investigation. They invoke national security. Does it make any difference? Well, no, Your Honor, it doesn't, because what Mitchell stands for, there you had a law enforcement agent in a national security context and the Supreme Court clearly implied a Bivens remedy. It specifically cites Bivens in footnote 7 of the opinion. And Bivens has never depended on the type of crime. The focus in the special factors case law is on the category of the defendant, on the type of plaintiff, type of defendant, and type of claim. And the upshot of the government's argument is that the same result would apply whether this happened in Kenya, Ethiopia, or in London. You'd be giving the government officials carte blanche to violate a U.S. citizen's right abroad because they're outside the United States. Because any of those kinds of cases would involve to some extent a foreign relations component. So I think there are two factors that may, and this is a close case. I'll say that at the outset. Two factors that may make this different. One is abroad, that it's happening abroad. And two, the national security component. And it's more than just a vague allegation of national security. It's suspected member or supporter of Al Qaeda in a congressionally authorized war. So those two things together are arguably, the government would say, a new context that we should be cautious about extending Bivens into. Maybe just one of those two wouldn't be enough. If we're in the United States, not enough. If it's abroad but a drug trafficking investigation, maybe not enough. But the two factors together, abroad and national security. So can you respond to that? I don't think Bivens has been extended abroad by the Supreme Court yet. So if you can deal with that, too. Well, as I said at the outset, Your Honor, our argument is this is not a new context. But even if the court were to conclude it was because it's, for example, those two factors, the national security and abroad, national security is not a trump card. The presence of special factors is not a trump card. And at the end of the day, under Wilkie, the court has to weigh the factors and exercise its judgment as a common law tribunal. And there are the fact we've got a U.S. citizen, and under this circuit and the Supreme Court's president, the U.S. citizen whose rights and liberties are threatened is entitled to the supreme protection. We've got judicial competence in handling exactly these types of claims, national security and claims involving extraterritoriality. And we have Congress, which has never suggested that there should not be a Bivens remedy. In fact, it's ratified Bivens. But in the wartime, let me just pose a question this way, the Fourth Amendment and how the Fifth Amendment apply to officers in these circumstances, there's going to be some black and white, but there's going to be some gray area, I assume, as to what they can and cannot do. And won't Bivens deter them from doing what they might otherwise do in the gray area? And is that a concern that we should be worried about, that Congress should be regulating the gray area in a wartime war-related effort? Well, I think what Congress has regulated, to the extent Congress has regulated what you describe as the gray area, it's regulated with the specific focus of military detainees and not law enforcement. As the Doe Court makes clear, that was kind of the DTA, was a regulation of individuals in military custody. And second, I think I want to keep it ‑‑ I think Your Honor's question is addressed at special factors. The extent that you're concerned about a gray area and the potential chill, I mean, I think that is a concern that's addressed by qualified immunity. I mean, the purpose of qualified immunity is not to deter officials from vigorously doing their job. As I said, we think the right was clearly established. But to deny a cause of action would not only cover those gray areas, which are covered by qualified immunity, it would give the government carte blanche. Mr. Hayfield, is Bivens constitutional common law in the sense that were a court to recognize a cause of action in this kind of context, nothing would prevent Congress from changing that, would it? I mean, it's not constitutionally compelled simply because the cause of action is based on the Constitution. Well, our position is were Congress to legislate it would at a minimum raise serious constitutional questions. But certainly one could reach the conclusion that Congress could preclude, could regulate the area and could preclude a Bivens remedy. An alternative remedy that had, you know, more clear immunities, that codified what counts as national security, that, you know, explained and took into account the overseas and national security concerns in a way that no current statutory law clearly does, right? And if they put that into effect, it would seem to me that that would be under, you know, Bush, Chilokee, Chappelle, Stanley. You know, we know that there would be authority, presumably, for Congress to do that, no? Yes, I mean, that's what those cases, the Bush and Schweiker cases suggest. But, you know, where Congress enacts a comprehensive remedial scheme that intentionally provides damages in certain claims or doesn't provide them for other claims, but we don't, I mean, that's not what's happened here. Congress has approved of the Bivens remedy and it's regulated in other specific areas, but it's never questioned Bivens against law enforcement. Right, no, I'm just saying, were we to go ahead thinking Congress had not foreclosed this, and if we were wrong, I'm just trying to figure out, let's say we were to go ahead and rule that there is a Bivens claim in this context. I'm just trying to understand the stakes of such a ruling. It would seem to me that Congress would have authority to say, oh, no, no, no, no, we actually didn't. Yes, I mean, certainly under Schweiker and those cases, the conclusion could be drawn that Congress had regulated and precluded, but at this point Congress has, if anything, suggested a Bivens remedy. Well, could Congress withdraw any remedy? In other words, if we rule in favor of you and the Supreme Court either agrees or doesn't touch it, could Congress withdraw any remedy, overturn the decision? I think that was Judge Pillard's question. Yes, absolutely. And provide nothing. And provide nothing. Our position is that for Congress to deprive a U.S. citizen of remedy for law enforcement violations, such as those here under Supreme Court's following the Supreme Court decision in Webster v. Doe, would raise serious constitutional questions at a minimum, but certainly, Your Honors, Congress could do that, and I think under Schweiker and those other cases, that would terminate a Bivens remedy. But Congress has not provided any other remedy and has not regulated with the rights in question. You've said a couple of times that Congress approved Bivens or ratified Bivens, and there's an interesting argument here that Westfall kind of validates that, because when they decided to codify the Westfall Act, they acknowledged that Bivens was out there. And so if we assume that you're right about that, that Congress was aware of Bivens and that they in some sense ratified it, at that time, they would have been looking at a Bivens that was domestic, that probably didn't involve national security. And doesn't that at least raise the question of what Congress would do in this circumstance? In other words, that they might not have ratified this kind of damages action for this kind of situation. Well, Your Honor, Congress in the Westfall Act in 1974 broadly preserved Bivens remedy against and rejected Justice Department proposals to essentially eliminate Bivens. At the time, the Constitution clearly applied abroad to U.S. citizens, and those types of Fourth and Fifth Amendment violations that Bivens, those core law enforcement violations that Bivens covers would have been within the review of Bivens. And when Congress legislated in the – yeah, I'll stop there, Your Honor. If this were a statute, if Bivens were a statute, any person injured in violation of the Constitution has a cause of action against the official for compensatory damages. We would apply the presumption against extraterritoriality to that statute, at least under the most recent Supreme Court case law, and would conclude, I think, that the statute, the Bivens statute, does not apply abroad, absent some congressional statement or indication to that effect. So how do we deal with Kiobel, Morrison, presumption against extraterritoriality here? Well, as you know, Your Honor, Kiobel, of course, is only a – it's only a presumption. The presumption can be overcome. The Constitution has long applied to U.S. citizens abroad, and Kiobel itself recognizes that the presumption may be overcome if a case that touches and concerns the United States – if we're talking specifically about Kiobel now, that was a foreign-cubed case, foreign plaintiff, foreign defendant, foreign territory. This case is very different. It's a U.S. plaintiff, it's a U.S. defendant. It's the only thing foreign is the territory. So I think, again, this is a statutory presumption. The presumption is in the context of legislation because Congress presumes to legislate with domestic concerns in mind. Although, as you know, Kiobel did say it was a – they recognized that it was not a statutory cause of action there, that it was a common law cause of action, but nonetheless applied the presumption. And you raised good arguments about why not to apply that here, I think, and that's another close issue here, I think, is how that applies here. You've raised a couple times that this is law enforcement, not national security. But isn't that a – isn't that either-or, not realistic in the way the FBI operates today and has operated post-September 11th? In other words, I think two presidents and lots of attorney generals have said that one of the tools in the war against al-Qaida is the FBI and domestic prosecution. So this divide that perhaps used to exist and to some extent doesn't exist anymore because a lot of what the FBI does is assist in the war effort. Well, our position is this was a law enforcement investigation that may have implicated national security. But, I mean, if we look at the specific allegations here, they were – FBI agents were taking Mr. Mishal out day after day, questioning him, they forced him to waive his Miranda rights, sign a waiver of rights for him, in order to obtain – to try to obtain a confession. You can look at the case of Daniel Maldonado. But they did that because they suspected, whether rightly or wrongly,  Yes, it's a law enforcement investigation with national security implications. But, you know, Bivens has never defended – depended on the type of crime. And I think your point is – underscores exactly the risk of denying any cause of action here because the extent the FBI is increasingly involved in national security and criminal investigations, there's a huge area or a gaping hole for U.S. citizens who will have no remedy if their rights are violated by law enforcement. So to the extent those are intertwined, I think that counts as in favor of remedy because it would leave a – give the FBI carte blanche to violate a citizen's rights in a number of cases. And the argument is also not limited to – So if – Terrence Worley. This might be a bit of a double bank shot, but if we recognize Bivens for FBI agents but not for CIA and military officials who do the same kind of activity abroad, wouldn't that be encouragement not to use the FBI in these kinds of activities? Encouragement to the executive branch when the executive branch has said repeatedly that they want to use the FBI and want to use the criminal process to assist the war effort rather than relying just on the CIA and military? Well, Your Honor, I think I'd answer it this way. There needs to be a line somewhere, and I think Doe provides one line where you're talking about people who are military detainees in a war zone. Here we're talking about FBI agents investigating someone for the purpose to obtain a confession. I mean, that's what really brings us close to Bivens here, outside of a war zone. Thank you.  There's three separate aspects of this case that distinguish it from a run-of-the-mine law enforcement case. First and foremost, the national security aspect, second, the foreign relations aspect, and third, the extraterritorial aspect, if I could take those in turn. This case would inevitably require inquiry into relations between various foreign governments who are alleged to have cooperated with the Bureau in investigating counterterrorism abroad in East Africa, and that is a quite significant aspect of this case. It actually makes it stronger in that regard. But it's a U.S. citizen. It's a U.S. citizen, so the floodgates would not necessarily open, and you know this kind of hypothetical is coming, but a U.S. citizen can be tortured, killed abroad by an FBI agent without remedy under your theory of the case. Well, I think that a couple answers to that, Your Honor. I think, first of all, the Doe Court recognized that an individual's citizenship is not sufficient in and of itself to mitigate otherwise present sensitivity. But the constitutional rights, at least as I understand the Constitution, goes with the U.S. citizen everywhere in the world vis-a-vis the U.S. government. So the U.S. citizen has a constitutional right abroad, whereas the non-U.S. citizen would not have a constitutional right abroad against the United States. Well, that's true. Now, I think it's also true that the manner and extent of constitutional protections that might apply to United States citizens abroad are not necessarily the same as those that would apply to U.S. citizens. I'm not sure I agree with you about that, but so assume you're not right about that. The Constitution of the Fourth Amendment and Fifth Amendment apply to U.S. citizens abroad, and obviously what's reasonable may be different, but, you know, it's troubling to think about the FBI can just, and CIA, under your theory, anyone, any U.S. official can detain a U.S. citizen forever without remedy. Two points on that. First, a legal point, and then a practical point. First, the legal point on the merits, whether there is a violation, is, of course, distinct from the threshold question under Bivens of whether there is any cause of action at all. And, I mean, all of these cases do involve troubling allegations. I mean, DOE involved very troubling allegations, but the court said that the national security and military concerns issue in that case. Counsel cautioned before applying a Bivens action. Second, I don't think it's quite right to say that there is no remedy whatsoever for a citizen in that circumstance. Number one, we do have the federal torture statute, which is admittedly a criminal statute, which does provide for criminal prosecution of the United States. Anywhere in the world, if a United States government official commits torture, that can be criminally prosecuted. And, second, we also do have the Torture Victim Protection Act, which would apply to the extent any such mistreatment was done under color of foreign law. Foreign law, yeah, not by the U.S. officials. Well, but I guess what I'm saying, I mean, keep in mind, Your Honor, in this case, the allegation is that there were various foreign governments involved in this mistreatment. I mean, one of the allegations is that the Somalis held Mr. Mishal under conditions that were bad, and I suppose there could be the potential, I guess, for a TVPA claim against the Somalis who are not party here. But under your position, someone who wasn't tortured, who was just deprived of Fourth and Fifth Amendment rights, you know, arrested without cause, locked up in London, you know, someone the United States didn't want to have out at a demonstration when dignitaries were visiting, no claim. No remedy there under the Torture Victim Protection Act, I would assume. Well, that's true, and that's true, and that's because, as the Supreme Court and this Court have made clear, in precedent dating back 30 years, the absence of a remedy, of any remedy, is not a reason to apply a non-statutory damages action, particularly in a sensitive context. Well, let's talk about what makes it sensitive. I mean, if we put aside in bracket the notion that there's simply no extraterritorial application at all and look to your slightly narrower ground that, well, this implicates foreign relations and or national security, how do we know in this case that national security is really implicated? Your position is extremely broad, and I noticed in your brief that the main authority that you cite, and I think you block quoted it four times, is the district court's description that this case implicates national security, threats in the Horn of Africa region, substance and sources of intelligence, the extent to which each government in the region participates or cooperates with U.S. operations to identify, apprehend, detain, and question suspected terrorists on their soil. We don't seem to have any statement by anyone, either Kenyan magistrate, American judge, even ex parte, not the commander in the Horn of Africa, not any delegate of the president, unlike in the LeBron case, nothing, saying we have reason to believe that this man is cooperating with terrorists. He was picked up, and there's no certification, as far as I'm aware, and maybe you can fill us in on that, that this person was, in fact, suspected to be an enemy combatant. Do we have such a determination? Well, Your Honor, this case is obviously at the pleading stage of the case, and so the allegations of the complaint must be taken as true, but I think as Your Honor pointed out quite correctly in the opening, as the case goes forward and has to be litigated, it's going to be inevitable that questions are going to arise about what was the manner of detention, why was it being detained, and it is the mere prospect of that kind of inquiry, litigation inquiry, that raises the sensitivities that this case implicates. So I have two questions about that. One is, can you tell me, as a representative of the government, whether there is a practice of some kind of determination of someone being an enemy combatant or suspected of being an enemy combatant? Is there any kind of practice or policy of doing that, or are we just going on these more functional questions, which are very serious, and I want to ask you about those, too, that, you know, what would a trial get into? But just as a threshold matter. Well, there are in certain contexts, maybe not applicable here, where we do make sort of formal determinations about an individual's status. I'm not aware that that's necessarily routinely done in the course of counterterrorism investigations. So I'm not aware of any such practice in this particular context. We have in the Gitmo detainee context, for example. Right, of course. We have something similar. And you see the concern, you know, that the Supreme Court has basically said, even in the context of aliens who don't enjoy these constitutional rights, there is some requirement that there be a threshold determination. It's very difficult at the pleading stage to say, without a reason to think any such determination has been made here, that national security is sufficient because it's a very broad rationale. Your Honor, it is precisely because such a determination must be made in this litigation that it raises sensitivities touching on foreign policy and national security. Let's talk about that. So we have the general statements by a very able district court judge hypothesizing about what might have to be gone into. But we also have extremely refined expertise in our district courts about how to deal with national security problems. We have, you know, Judge Bates' opinion, and Abueli dealing with the habeas petition, very similar issues. And, again, not, you know, state secrets, in camera, you know, qualified immunity. You know, there are many, many ways that we can deal with classified information and national security, and my question to you is, wouldn't that be the way to deal with concerns that I think are very grave and legitimate concerns the government has in these kinds of cases? Well, this court in Wilson v. Libby rejected the argument that the presence of those kind of safeguards mitigate the possibility that a case might implicate sensitive intelligence matters, and so did the Second Circuit in Iraq. Well, Wilson is a little bit of a different case, right, because there was the Privacy Act, and that was more like a Bush v. Lucas, you know. There's a separate regime dealing with the claims there. No, no, Your Honor. Respectfully, I disagree. I mean, I think the court was willing to assume that in Wilson the plaintiff there would have had no remedy under the Privacy Act whatsoever. It was specifically excluded. And then in Davis v. Billington in 2012 made that determination even more pointed with regard to a plaintiff who was excluded under the Civil Service Reform Act. But when Congress has a Civil Service Reform Act or the Privacy Act, when they've done a detailed scheme, they don't have to provide a remedy. They've considered and they've said, okay, in this situation we have a CIA operative. There are reasons why we're not going to go into her relationship with the government, and that she gives that up. And it's like the military cases. Someone goes in, and they're subject to military chain of command. They may not get any damages anywhere. And that's clearly established under our Supreme Court precedents. This is quite different. Well, actually, no, Your Honor. I don't think it is any different. As this Court noted in Doe v. Rumsfeld, congressional action in the field of overseas interrogation and detention has been anything but inadvertent. And just to correct one thing that counsel said, Doe relied on the Detaining Treatment Act for that. The Detaining Treatment Act is not limited to military personnel. It applies to all U.S. government personnel. All U.S. government personnel cannot engage in cruel, inhumane, or degrading treatment anywhere in the world under the Detaining Treatment Act. And that's clear. It's also clear that Congress, in enacting the federal torture statute, in enacting the Torture Victim Protection Act, in enacting the Military Claims Act, and all these various forms of legislation, Congress did not create a damages action that applies in this context. And I think that is something like a scheme that indicates, that is indicative of Congress's intent in this context, as this Court held in Doe v. Rumsfeld. But this wouldn't be a new category of defendants, nor a new kind of cause of action. No, I disagree with that, Your Honor. It would be a new... Let's say, just focus on the Fourth Amendment. A Fourth Amendment claim against FBI agents, that's core Bivens. Well, but just because it's a Fourth Amendment claim doesn't mean it's not a new context. I mean, Wilkie was a Fourth Amendment case, for example. I mean, the Supreme Court has said, you can't just say, same constitutional amendment done. You have to look at the context. And this is what this Court had to say in Doe about that, in saying that it was a new context. The Supreme Court has never implied Bivens remedy in a case involving the military, national security, or intelligence. And so I think this Court, Doe, recognized that that would be a new context. And the Court, in Vance, did the same thing, in noting that the Supreme Court has never recognized Bivens action or conduct that occurred by United States officials. So, just on your position, can I ask, if this had happened in the United States, what was national security related in the sense of suspected al Qaeda? Bivens? It would be a more difficult case, Your Honor, but we are not urging any categorical rule that a Bivens action is unavailable, simply because it involves a counterterrorism investigation. However, I would say this. I mean, in both, in the LeBron case, that involved detention that did occur in the United States. Right. And the Court didn't just say it occurred in the United States. Go home. The Court looked at the sensitivities that the claim raised. And so I think in an appropriate case, we might or might not assert a special kind of defense. To the extent Bivens is a deterrent of behavior that we, as a system, as a country, want to be deterred, why isn't it good to have a Bivens remedy for these kinds of situations with qualified immunity, as counsel rightly stated, as the backdrop that provides a lot of protection and running room in the gray area for your clients? Well, I mean, the Supreme Court and Stanley could not have been more clear that the question of immunity is entirely distinct from the threshold question of whether there's a Bivens action. But I think, as Your Honor pointed out in the opening, I mean, since the Bivens inquiry is very context sensitive, I mean, I don't think that U.S. officials can count on getting a special factors defense. So there is still a deterrent, because you can't be certain whether a special factors defense would actually be accepted. It depends on the circumstances. Well, if we rule the way you want us to rule, they'll know. Then they'll know. Well, no. But, again, we're not contending. We're not even contending for a categorical rule for stuff that happens abroad. It would depend on the circumstances. The reason this case is sensitive is because of the specific allegations it asserts. In particular, this notion that the court is going to preside over litigation, exploring our relationship with foreign governments. I mean, no foreign government, if that case were going to go forward, no foreign government is ever going to want to cooperate with us in a counterterrorism investigation. Is that the only problem here, because it would call into question relationships with other countries? Because there are a couple of different allegations here. One, the detention might involve that. But what about just the interrogation? That's right, Your Honor. But even with regard to that claim, it would certainly implicate that. Because I suppose what you're going to have to have is we're going to have to figure out what happened. So we're going to have to subpoena the official who was present at the interrogation in Kenya, the cellmate. We're going to have to figure out what the conditions of confinement were abroad. We're going to have to figure out what the police officers saw, what they heard. And you think that all of this would be implicated if you were just looking at the claim of unlawful interrogation? Absolutely. And even beyond that, I mean, the allegation in this case is that the interrogation was conducted pursuant to national security policies and authorization by... Let me ask you about that, because the government says that repeatedly. So I have a couple of questions about that. One is, at this point, you acknowledge that this is very early on in this case. And so aren't we required to just accept the allegations in the complaint at this point? And what the complaint says is this is a criminal investigation. Well, but the complaint also notes that the defendants were part of a combined joint task force whose mission was to conduct counterterrorism operations abroad. So the complaint also alleges that. But, Mr. Whitaker, that would apply to almost our entire counter-narcotics program as well, wouldn't it? That we collaborate with other governments and counterfeiting, you know, anti-counterfeiting crime and foreign corrupt practices. I mean, we are a global law enforcement regime at this point, so that's a very broad rationale as well. Well, I believe this is more, I guess, the national security rationale. And I think to the extent a claim is going to require exploration of the relationship between the diplomatic relations between us and foreign governments, I think that is a very sensitive matter, and it would be, I think, bad do if foreign governments stopped participating in our counter-narcotics, international counter-narcotics operations. And is there no, does State Secrets not cover that, or are there other more targeted doctrines that cover that in a trial context? Well, once again, I think this Court in Wilson specifically rejected the argument, and actually it was rejected in Doe as well, that the State Secrets doctrine somehow exhausts the interest and the sensitivities that are implicated by this case. And again, we invoke State Secrets only in extremely narrow circumstances. So that would leave a broad water of cases. Right. That cuts both ways, though, really. I mean, the reason that we're very careful about invoking it is because it's strong medicine, because cutting off litigation is, you know, in the name of national security, it's very strong for foreign relations. Let me ask you, though, you had mentioned before that you thought the Detainee Treatment Act was somehow a bar because it indicated that Congress did not want a claim like this to go forward. And I actually read it differently, given the immunity provision, which, I mean, it's very interesting because your position would be that in enacting the Detainee Treatment Act, the McCain Amendment, the main purpose of which, as I understand it, was to say, make no mistake about it, the United States is categorically opposed to torture, cruel, and human-integrating treatment. And then there's an immunity provision because, of course, people working in the government were concerned that that would open them, expose them to liability. And the immunity provision says no alien can bring a claim, civil or criminal, as long as the president or his designee has made a determination that the alien is engaged in or associated with international terrorist activity. So there's an immunity there, but an assumption, a background assumption, that there could be civil or criminal action. And I assume that because that immunity is only with respect to aliens, that the assumption, the background assumption that existing kinds of litigation, be it habeas, be it bivens, be it a criminal action involving U.S. citizens, are unaffected by the Detainee Treatment Act. Is that wrong? Yes, that's completely wrong. And it was rejected by, that exact same argument was rejected in Doe. And if you read on the immunity provision, and I don't have it in front of me, and it's been a while since I've looked at it, because it's not been raised in this case, but I'll answer your question. I mean, the immunity provision has something in there saying it's not intended to immunity, some language about that, that it's not intended to be exclusive. Well, it's a defense that an officer, employee, member of the armed forces, or other agent did not know that the practices were unlawful, and a person of ordinary sense and understanding would not know the practices. No, no, but there's something, again, I don't have it in front of me, and I apologize for that, Your Honor, because it hasn't been raised here. Well, you've raised the Detainee Treatment Act, and so what we're looking at is what is the scope of the Detainee Treatment Act. Well, and this Court rejected that argument by citing the Detainee Treatment Act as an example of which involved in that case involved a U.S. citizen, too, and the plaintiffs in Doe made exactly the same argument that the immunity provision meant that the Detainee Treatment Act did not mean that Congress's actions were not inadvertent. But, I mean, there is the distinct aspect of that case, which is that it was a case against the military, right? Doe was a case against the military, and that's an area in which the Supreme Court has looked at their vins, you know, and has said remedies military chain of command, and then in Judge Sintel's opinion he says, yeah, the fact that this is a civilian contract, we don't think takes it out of that. Except the Detainee Treatment Act, as I mentioned, is not limited to the military. Right. But more fundamentally, I don't think that that conception of congressional intent that Your Honor just articulated could be squared with the Stanley case, and Congress enacted that provision against the backdrop of the Stanley case and, indeed, Bivens itself, which indicates that the question of immunity is entirely distinct from the special factors inquiry. So I don't think the fact that Congress established immunity speaks at all to the existence of a Bivens action. And, again, the fact that... Isn't it? Go ahead. I'm sorry. And the court in advance talked about this, actually, Your Honor, and the court in advance noted any number of instances where Congress makes doubly sure to preserve various immunities, but that did not in any way mean that Congress implicitly sanctioned a Bivens action. It seems quite clear to me, and I will go back and look at Vance again, but it seems quite clear to me in reading the Detainee Treatment Act that it is simply declaring as a substantive matter the United States' position on torture, cruel and degrading treatment, and at the same time providing an immunity, but an immunity that acknowledges the background of potential ways that these things can get into court, and doesn't go into them, doesn't push them aside. I mean, it might acknowledge other potential ways of getting into court, but that doesn't necessarily mean a Bivens action is going to be available in each case. But it doesn't mean it's going to be unavailable. Well, I mean... I mean, it seems like it's preserving the right of aliens to bring civil action. Well, first of all, I mean, one argument in Doe was that, which was rejected, was that the Doe, that immunity provision meant that Congress necessarily contemplated the existence of a Bivens action. And we pointed out in our brief that that's actually not true, because there's any number of kinds of other kinds of tort actions that Congress could have been aiming at. For example, actions under the Religious Freedom Restoration Act, common law tort actions, and so forth, and maybe even a CDPA action. That's point number one. But two, this general notion that creating an immunity, that the creating immunity would result in the affirmative recognition of a Bivens action, is fundamentally contrary to the Supreme Court's precedence in this area, which indicate that Bivens is really the exception, not the rule. So I don't think that that kind of negative implication from the Detainee Treatment Act would be decisive here. But more broadly, I mean, we have more than just the Detainee Treatment Act standing alone. We also have the presumption against extraterritorial application of statutes. And I mean, if we had a statute, as Judge Kavanaugh pointed out, if we had a statute that created a cause of action that said, for treatment broadly, let's say, mistreatment broadly, we would presume that that did not apply extraterritorially. And that presumption applies a fortiori here, where we do not even have a statute. The question is whether there is a non-statutory cause of action. Your Honor, I see my time has expired, but I'd be happy to answer further questions that the Court has. I just have one question about sort of the practical consequences for the government. Do you have any information I think you can point us to about the number of Bivens cases that are filed, in particular the number of Bivens cases arising abroad or touching on national security in the last decade or so? I don't have it handy. I can certainly look into that, Your Honor, and do a letter. But I will say this. I mean, if the Court were to recognize a Bivens action, I mean, one of the reasons I think such actions, and I would imagine such actions are rare, but if the Court were to recognize a Bivens action in this case, I imagine that would not be true. So the Court, the effect of the Court's, I think the Court has to recognize that the effect of the Court's action could itself have an effect on the nation. Although I'm interested even, I mean, my experience in the government is a long time ago, but even in domestic, you know, garden variety Bivens, there's not a lot of cases that get very far. Anyway, it's just a, just. Yeah, I don't have those statistics handy. I mean, I'm happy to look into it and get back to the Court and send a letter if the Court would like. If there are no further questions, I'll sit down. Mr. Havits, you have no time remaining, but we'll give you two minutes if you need it. Thank you, Your Honor. Very quickly, I'll run through a few points. We acknowledge that there were national security implications, but this was a criminal investigation. I would point you to, again, the treatment of Daniel Maldonado. Parallel to Mr. Michal, Mr. Maldonado is interrogated by the FBI. He confesses. He goes home. Mr. Michal maintains his innocence. He spends four months in detention and endures coercive threats. Second, the FBI, as the Donald Borelli brief makes clear, is bound by the Constitution. And that's all that is in question here. The FBI's treatment of a U.S. citizen in violation of the Constitution. In terms of Congress, the Westfall Act, I would note, was amended in 1988, so Congress returns to Bivens the question of Bivens after Michal and makes clear and maintains that law enforcement agents, and that's all we're talking about here. We're not talking about the military. We're not talking about the CIA. We're talking about core misconduct by law enforcement agents, and Congress makes clear that Bivens remains. As Judge Spillard pointed out, the implications of the government's position is that this would apply to all extraterritorial misconduct by the FBI, abusive detention, and torture, because the FBI always needs the permission of a foreign government to operate on its territory. So it would apply to every country. Well, just to be fair, I think they said it would not be categorical abroad, national security, and you look at the factors. Just to be fair about their position. Okay, well, and the DTA, Your Honor, the government's position on the DTA, DOE was specifically focused on the military, but if you take the government's position, the DTA is not limited by territory. So their position is if the DTA bars Bivens, it would bar Bivens in the United States for all federal prisoners. Finally, I want to pick up on Judge Brown's question if I may. I just have a moment. You're right to point that out, Judge Brown. We have a detention claim and an interrogation claim. We think both should stand, but they are different, and all the government's foreign relations arguments are really directed at the detention claim. The interrogation claim, the threats that the FBI made against Mr. Michelle, threats of death and disappearance, do not require an inquiry into whether or not the U.S. was, as we've alleged, that the Kenyan and Ethiopians were the agents of the FBI, as we've alleged. You would be giving, let's be clear, you would be giving the government carte blanche to law enforcement to violate a U.S. citizen's core rights through torture, brutal torture, disappearance, years of detention, and there would be no remedy. There were criminal statutes in Bivens. They bring up criminal statutes. You make very forceful and good arguments here. And to reiterate, I think it's a close case, one thing I'm trying to figure out how to factor in. It's not going to be an easy question to answer, but if you just step back and look at the grand sweep of the Supreme Court's case law on Bivens, you see skepticism and caution and limits, and you see Justice Souter and Wilkie and you see Chief Justice Rehnquist and Velasco, and you see all these opinions that really say it's not quite this far and no further, but it's definitely skepticism. And then you see that definitely trickle down, I think, in LeBron and Vance and Doe. And it seems I'm concerned to the extent I get out of step with that, with where the Supreme Court's pointing. And they haven't answered this case, so I understand that, but just the general trend of their case law has been be cautious about a non-statutory cause of action. If I may, again, those cases are really different. You're talking about new defendants, military in Vance and Doe. You're talking about in Minechi. You're talking about private prison employees where there are also alternative remedies. Wilkie, you're talking about a totally different claim for retaliation with trespass rights. I mean, here we really are at the core of Bivens, core law enforcement. So that's true. I mean, in the end, your answer is this is Fourth Amendment and Fifth Amendment. The Fourth Amendment, FBI, core Bivens, just hold with that. Yeah. And only in Minechi, Judge, if I may, there are only two of the justices who really focused on that it should be the precise circumstances. I agree with you on that. I wasn't trying to overstate that. It's not exactly that, but they're definitely cautious. Yeah, I agree with you. The government says they are not looking for a categorical rule. Are you? In other words, what you're wanting the court to say is that in these kinds of circumstances, a Bivens action would always be available. We're talking about a very limited category of cases. We're talking about, as the government acknowledged, talking about U.S. citizens whose rights are egregiously violated, as the district court concluded, by law enforcement agents. We're not talking about military. We're not talking about intelligence officials. We're not talking about a war zone. We're talking about a very limited category of cases. And conversely, again, to deny a remedy here would leave the FBI and law enforcement agents with the freedom to violate U.S. citizens' rights outside the United States. And I think, as the DTA point and the government's point, the DTA makes clear would have implications for federal prisoners within the United States. We're asking for something that's, I think, very limited and is on a par with the court's long recognition, the circuit's long recognition, of the rights to U.S. citizens' Fourth and Fifth Amendment rights when they're abroad. There would be no question that if Mr. Mischel had been brought back in charge, he would have been able to assert those rights. The court would have adjudicated these exact claims. But because he wasn't charged, because he's innocent, he's denied a remedy. And that's directly contrary to Justice Harlan's teaching in the concurrence of Bivens itself. Thank you. Thank you, Your Honor.
judges: Brown, Kavanaugh, Pillard